UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08  CV  7905

| | |
|---|---|
| SANDRA ARACE, Derivatively on Behalf of Wachovia Corporation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| G. KENNEDY THOMPSON, RUTH G. SHAW, PETER C. BROWNING, ROBERT A. INGRAM, MACKEY J. MCDONALD, TIMOTHY D. PROCTER, JOHN D. BAKER, II, JOHN T. CASTEEN, III, JEROME A. GITT, WILLIAM H. GOODWIN, JR., MARYELLEN C. HERRINGER, DONALD M. JAMES, JOSEPH NEUBAUER, ERNEST S. RADY, VAN L. RICHEY, LANTY L. SMITH, and DONA DAVIS YOUNG, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| -and- | ) ) |
| WACHOVIA CORPORATION, a North Carolina Corporation, | ) ) ) |
| Nominal Defendant. | ) ) ) |

Civil No.

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

JURY TRIAL DEMANDED

RECEIVED
SEP 10 2008
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Sandra Arace ("Plaintiff") by her undersigned attorneys, for her Verified

Shareholder Derivative Complaint, based upon, *inter alia*, the investigation made by and through

her attorneys, alleges as follows:

## SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of nominal defendant

Wachovia Corporation ("Wachovia" or the "Company") against its Board of Directors (the

"Board") and senior current and former officers for their breaches of fiduciary duty, mismanagement and other unlawful acts.

2.      In derogation of the Company's own internal policies and Federal and State laws and regulations, the defendants, knowingly, or with reckless disregard of their fiduciary obligations:

(a)  enabled a massive fraud to be perpetrated by the Company upon consumers by turning a blind eye to deceptive telemarketing practices involving the Company, subjecting Wachovia to regulatory actions, civil lawsuits and investigations, fines, penalties and judgments, and harm to the Company's reputation, to the detriment of the Company and its shareholders;

(b) notwithstanding the well-publicized red flags from U.S. law enforcement as to the frequent use of money-exchange houses, the so-called *Casas de Cambio*, by drug cartels to launder money, the defendants caused or failed to prevent the Company from serving as a large partner for these institutions by holding their deposits, providing them lines of credit, overdraft privileges and remittance-processing services, resulting in the Company being investigated by the Justice Department for its role in the alleged laundering of drug proceeds by Mexican and Colombian cartels and causing the Company to face a prosecution that would require extensive federal oversight and could result in substantial penalties and fines;

(c) caused the Company to misrepresent or fail to disclose numerous factors relating to the quality, risk and characteristics of auction rate securities that the defendants sold between March 19, 2003 and February 13, 2008, leaving, as a result of the collapse of the market for auction rate securities in February 2008, the holders of over $300 billion in auction rate securities with no means of liquidating these investments.  As a result, the Company has received

2

inquiries and subpoenas from the Securities and Exchange Commission (the "SEC") and state regulators, has been subject to onsite inspections as a result of the defendants' failure to fully comply with regulators' requests, numerous class action lawsuits relating to its practices with regard to auction rate securities, and has already spent and will spend millions of dollars in legal fees relating to these investigations and lawsuits; and

(d) approved or recklessly disregarded the Company's overexposure to risk associated with investments in bank-owned life insurance policies ("BOLI"). Wachovia invested approximately $1 billion in BOLI vehicles, and lost as much as $315 million as a result of the precipitous 75% plunge of Citigroup Inc.'s ("Citigroup") Falcon Strategies hedge fund. The defendants, in violation of their fiduciary duties, failed to establish internal controls necessary for due diligence prior to making the investment and have failed to take measures to recoup the losses the Company suffered from Citigroup and/or third parties.

3.      Defendants' acts and/or inactions were in violation of their fiduciary duties. Those violations have already caused severe damage to Wachovia's business, financial condition and reputation, including the loss of hundreds of millions of dollars in settlements, penalties and legal fees and the forced resignation of its longtime Chief Executive Officer, in light of the Company's tarnished reputation, and will result in further irreparable harm, as well as subject the Company to heightened regulatory scrutiny going forward. Plaintiff demanded that the Wachovia Board take appropriate action against its members, current and former members of Wachovia senior management and/or third parties to recoup that damage, but to date they have done nothing. Absent this lawsuit, Wachovia's losses will go uncompensated.

3

## PARTIES

4.    Plaintiff Sandra Arace is, and at all times relevant hereto, was a holder of Wachovia common stock. She is a resident of New Jersey.

5.    Nominal Defendant Wachovia is a North Carolina corporation with its principal executive offices located at One Wachovia Center, Charlotte, North Carolina 28288-0013. The Company provides a wide range of commercial and retail banking and trust services through full-service banking offices throughout the nation. Through its subsidiaries, Wachovia provides various other financial services, including mortgage banking, investment banking, investment advisory, home equity lending, asset-based lending, leasing, insurance, international and securities brokerage services. Wachovia stock is traded on the New York Stock Exchange under the symbol "WB."

6.    Defendant G. Kennedy Thompson ("Thompson"), a resident of North Carolina, was Chairman of the Board of Wachovia until May 8, 2008. He also served as the Company's CEO, President and a director until June 1, 2008, when he retired from those positions at the request of the Board.

7.    Defendant Ruth G. Shaw ("Shaw"), a resident of North Carolina, has served as a director of the Company since 1990 and is the Chairman of the Compensation & Management Resources Committee and a member of the Nominating & Corporate Governance Committee of the Board. Shaw is a director of the Dow Chemical Company and DTE Energy Company.

8.    Defendant Peter C. Browning ("Browning"), a resident of North Carolina, has served as a director of the Company since 2001 and is a member of the Management Resources & Compensation Committee, the Corporate Governance & Nominating Committee, and the

Executive Committee of the Board.  Browning is also a lead director of Nucor Corporation, and serves as a director of Acuity Brands Inc., EnPro Industries, Inc., Lowe's Companies, Inc., and the Phoenix Companies.

9.      Defendant Robert A. Ingram ("Ingram"), a resident of North Carolina, has served as a director of the Company since 2001 and is the Chairman of the Corporate Governance & Nominating Committee, and a member of the Management Resources & Compensation Committee and Executive Committee of the Board.  Ingram serves as a director of Allegran, Inc., Edward Lifesciences Corporation, Lowe's Companies, Inc., OSI Pharmaceuticals, Inc. and Valeant Pharmaceuticals International.

10.      Defendant Mackey J. McDonald ("McDonald"), a resident of North Carolina, has served as a director of the Company since 1997 and is a member of the Compensation & Management Resources Committee and the Corporate Governance & Nominating Committee of the Board.  Mackey is a director of VF Corporation.

11.      Defendant Timothy D. Proctor ("Proctor"), a resident of North Carolina, has served as a director of the Company since 2006 and is a member of the Management Resources & Compensation Committee of the Board.

12.      Defendant John D. Baker, II ("Baker"), a resident of Florida, has served as a director of the Company since 2001 and is a member of the Audit Committee.  Baker is President, Chief Executive Officer and a director of Patriot Transportation Holding, Inc., and currently serves as a director of Vulcan Materials Company.

13.      Defendant John T. Casteen, III ("Casteen"), a resident of Virginia, has served as a director of the Company since 2001 and is a member of the Audit Committee of the Board.

14.     Defendant Jerome A. Gitt ("Gitt"), a resident of California, has served as a director of the Company since 2006 and is a member of the Audit Committee of the Board.

15.     Defendant William H. Goodwin, Jr. ("Goodwin"), a resident of Virginia, has served as a director of the Company since 1993 and is a member of the Executive Committee, the Nominating & Corporate Governance Committee and the Risk Committee of the Board.

16.     Defendant Maryellen C. Herringer ("Herringer"), a resident of California, has served as a director of the Company since 2006 and is a member of the Risk Committee of the Board.  Herringer also serves as a director of ABM Industries Incorporated, Pacific Gas & Electric Company and PG&E Corporation.

17.     Defendant Donald M. James ("James"), a resident of Alabama, has served as a director of the Company since 2004 and is a member of the Risk Committee of the Board.  James is Chairman and Chief Executive Officer of Vulcan Materials Company and serves as a director of the Southern Company.

18.     Defendant Joseph Neubauer ("Neubauer"), a resident of Pennsylvania, has served as a director of the Company since 1996 and is chairman of the Audit Committee and a member of the Executive Committee and the Corporate Governance & Nominating Committee of the Board.  Neubauer is a director of Aramark Corporation, Macy's, Inc. and Verizon Communications, Inc.

19.     Defendant Ernest S. Rady ("Rady"), a resident of California, has served as a director of the Company since 2006 and is a member of the Risk Committee.

20.     Defendant Van L. Richey ("Richey"), a resident of Alabama, has served as a director of the Company since 2004 and is a member of the Risk Committee.

21.     Defendant Lanty L. Smith ("Smith"), a resident of North Carolina, is Chairman of the Board of Directors since May 2008, when he replaced Defendant Thompson. He also served as interim CEO from June 1, 2008 through July 9, 2008. He has served as a director of the Company since 1987. He is chairman of the Executive Committee, and is a member of the Audit Committee and the Corporate Governance & Nominating Committee.

22.     Defendant Dona Davis Young ("Young"), a resident of Connecticut, has served as a director of the Company since 2001 and is a member of the Executive Committee and chairman of the Risk Committee of the Board. Young is a director of Foot Locker, Inc. and the Phoenix Companies.

23.     The individuals listed above in ¶¶ 6 through 22 are collectively referred to as the "Director Defendants."

24.     (a)     The Director Defendants, by reason of their status as officers and executives or members of the Board, have and had the power and influence and did in fact control and influence and cause Wachovia to engage in the unlawful acts and conduct complained of herein. Each of the defendants is liable as a direct participant in, and aider and abetter of, the wrongs complained of herein.

(b)     By reason of their positions and because of their ability to control the business and corporate affairs of Wachovia at all relevant times, the defendants owe and have owed Wachovia and its shareholders the highest fiduciary obligations of fidelity, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage Wachovia in a fair, just, equitable and lawful manner. In addition, each director of Wachovia owes and has owed to Wachovia and its shareholders the fiduciary duties to exercise due care and

diligence in the administration of the affairs of Wachovia, compliance with contractual and legal obligations, and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing.

25.    The Director Defendants are charged with numerous responsibilities in managing the Company's everyday business and affairs.  Specifically, according to the Company's Corporate Governance Guidelines:

> Wachovia's business is managed under the direction and oversight of the Board of Directors.  The Board appoints Wachovia's Chief Executive Officer and its senior management team who are responsible for the day-to-day conduct of Wachovia's business.    The Board's primary responsibilities, thereafter, are to oversee management, and to exercise its business judgment to act in good faith and in what each director reasonably believes to be in the best interests of Wachovia.  In addition, in fulfilling its responsibilities, Wachovia expects that the Board of Directors will:

> • Represent the collective interests of all of Wachovia's stockholders;

> • Demonstrate objectivity and the highest degree of integrity on an individual and collective basis;

> • Promote Wachovia's vision and values, and adopt and follow Wachovia's code of conduct and ethics, as well as promote Wachovia's other policies regarding compliance with applicable laws, regulations, and ethical standards;

> • Apply themselves to understanding Wachovia's business, and the significant risks facing Wachovia;

> • Review and monitor long-term business strategies, plans, goals and business objectives of Wachovia as presented by Wachovia's senior management;

> • Evaluate on a regular basis Wachovia's financial performance;

> • Ensure that processes, controls and procedures are in place to assure the maintenance and integrity of Wachovia's accounting and financial records and statements;

- Conduct objective and thorough reviews and assessments of the Chief Executive Officer's performance, and, with the assistance of the Chief Executive Officer, other members of senior management;

- Devote adequate time to Board and committee matters;

- Attend the Annual Meeting of Stockholders;

- Conduct management succession planning and review; and

- Evaluate the overall performance and effectiveness of the Board.

26.    The defendants, because of their positions of control and authority as executive officers and/or directors of Wachovia, knew the business of Wachovia, as well as its financial performance and business operations via access to internal corporate documents (including Wachovia's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their positions, the Director Defendants were able to and did, directly and indirectly, control the matters and transactions complained of herein.  These defendants have and have had the duty to exercise reasonable control and supervision over the officers, employees, agents, business and operations of the Company; to be and remain informed as to how the Company was operating and, upon receiving notice or information of an imprudent, questionable or unsound decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and to conduct the affairs of the Company to strictly comply with all applicable laws and regulations,

9

including the Company's Corporate Governance Guidelines, provide the highest quality services, and maximize the profitability and reputation of the Company, for the benefit of its shareholders.

## JURISDICTION AND VENUE

27. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different States. This action was not brought collusively to confer jurisdiction on a court of the United States that it would not otherwise have.

28. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things, Wachovia maintains significant operations and has dozens of branches in New York, New York. Moreover, Wachovia stock is traded on the New York Stock Exchange and defendants have received substantial compensation by doing business here and engaging in numerous activities that had an effect in this District.

## SUBSTANTIVE ALLEGATIONS

### The Telemarketing Scheme

29. The Company's website claims that "Wachovia is committed to protecting your personal data as well as your money. Wachovia Security Plus$^{SM}$ combines a wide variety of fraud prevention programs, sophisticated analysis tools and backroom processes to pinpoint and analyze suspicious activity. This helps us detect and prevent fraud and reassure you that your personal and financial information, as well as your money is as safe online as it is at home, at the branch or over the phone." In derogation of this important policy, and with knowledge or reckless disregard to its fiduciary obligations, the Company knowingly enabled a massive fraud to be perpetrated against consumers, subjecting Wachovia to regulatory and civil lawsuits and

investigations, potential fines, penalties and judgments, and harm to the Company's reputation, to the detriment of the Company and its shareholders.

30.    On April 12, 2007, a class action complaint was filed against the Company in the United States District Court for the Eastern District of Pennsylvania[1] (the "Telemarketing Action"), alleging that the Company allowed telemarketers to use Wachovia bank accounts to steal millions of dollars from unsuspecting consumers.

31.    As alleged in the Second Amended Complaint (the "Complaint") filed in that action, Wachovia was aware that payment processors were engaged in a telemarketing scheme to defraud consumers, and "conspired with the payment processors by opening accounts and clearing millions of dollars in remotely created drafts issued by the processors and made out to the fraudulent telemarketers." The Complaint further alleged, among other things, that Wachovia knew that a significant number of these drafts were issued based upon banking information fraudulently procured by telemarketers; that payment processors and remotely created drafts were frequently used to advance fraudulent telemarketing schemes; and that the accounts opened involved entities run by convicted perpetrators of consumer fraud. In furtherance of this scheme, Wachovia obtained special agreements from its co-conspirators according it protections beyond those provided by the Uniform Commercial Code as a condition for continuing to maintain the accounts and participating in the scheme.

32.    After the filing of the Telemarketing Action, defendants denied the suit's allegations and any knowledge of fraudulent activities.

---

[1] *Faloney v. Wachovia Bank, N.A.*, Civil Action No. 07-CV-1455 (E.D. Pa.).

33.     However, in an article titled "Papers Show Wachovia Knew of Thefts," *The New York Times* reported that "newly released documents from that lawsuit now show that Wachovia had long known about allegations of fraud and that the bank, in fact, solicited business from companies it knew had been accused of telemarketing crimes." The article highlighted specific communications which alerted the Company to the ongoing scheme:

> Internal Wachovia e-mail, for example, show that high-ranking employees at the nation's fourth-largest bank frequently warned colleagues about telemarketing frauds routed through its accounts.

> Documents also show that Wachovia was alerted by other banks and federal agencies about ongoing deceptions, but that it continued to provide banking services to multiple companies that helped steal as much as $400 million from unsuspecting victims.

> "YIKES!!!" wrote one Wachovia executive in 2005, warning colleagues that an account used by telemarketers had drawn 4,500 complaints in just two months. "DOUBLE YIKES!!!" she added. "There is more, but nothing more that I want to put into a note."

> However, Wachovia continued processing fraudulent transactions for that account and others, partly because the bank charged fraud artists a large fee every time a victim spotted a bogus transaction and demanded their money back. One company alone paid Wachovia about $1.5 million over 11 months, according to investigators.

> "We are making a ton of money from them," wrote Linda Pera, a Wachovia executive, in 2005 about a company that was later accused by federal prosecutors of helping steal up to $142 million.

> *            *            *

> AmeriNet was a "payment processor," a company that creates unsigned checks on behalf of telemarketers to withdraw funds automatically from customer accounts. Such checks, once widely used by businesses collecting monthly fees, are legal if customers approve the transactions.

> However, a Wachovia executive wrote to colleagues, evidence suggested AmeriNet was creating unapproved checks.

12

"Keep in mind historically, telemarketing is an easy way to money launder and commit fraud. To knowingly bank a customer who is perpetrating fraud places the bank at great exposure," wrote that executive, Tim Brady, according to documents that are part of the lawsuit.

Mr. Brady, who did not return phone calls, recommended closing the AmeriNet account in 2003, according to that e-mail message. But Wachovia continued working with the company until 2005, when AmeriNet paid $50,000 to settle complaints filed by the attorneys general of five states. Wachovia was not named in those complaints.

In late 2003, a Wachovia executive announced to colleagues via e-mail that her unit, because of AmeriNet, had seen "an increase in our annual revenue projection."

*     *     *

There were other internal warnings, as well.

In 2005, a Wachovia fraud investigator wrote to colleagues that 79 percent of the checks submitted by one Wachovia client, Suntasia, had been returned in August because of unauthorized withdrawals and other problems. Regulators say return rates in excess of 2.5 percent is evidence of potential fraud.

"I have good reason to believe that all of the deposited items are unauthorized drafts," wrote the fraud investigator, Bill McCann in a 2005 e-mail message.

*     *     *

In the last three years, government agencies have sued several companies accused of routing telemarketing thefts through at least nine banks, including Wachovia, the largest company named in those lawsuits.

34.     On April 26, 2008, *The Wall Street Journal* reported that Wachovia agreed to pay $144 million to the Office of the Comptroller of the Currency (the "OCC"), the second-biggest settlement achieved by the OCC, stemming from the regulator's investigation into the Company's relationship with telemarketers that "allegedly harmed between 350,000 and 500,000 consumers, many of them elderly." The OCC's main allegation was that bank officials knew about the fraudulent telemarketing practices but failed to take any action to resolve the problem.

The article further reported that the Company still faces at least two class-action lawsuits related to the telemarketing matter, "which could be strengthened by the OCC's findings."

**Money Laundering**

35.     Also on April 26, 2008, *The Wall Street Journal* reported that the Justice Department commenced an investigation of the Company's role in the alleged laundering of drug proceeds by Mexican and Colombian money-transfer companies and that the Company faces a prosecution that would require extensive federal oversight and penalties.  The Government's investigation focuses on Wachovia's relationship with money-exchange houses, so-called *Casas de Cambio*, which facilitate workers' remittances and other cross-border transfers.  The Company is alleged to have knowingly served as a large partner for these institutions, holding their deposits, providing them lines of credit, overdraft privileges and remittance-processing services, despite well-publicized red flags from U.S. law enforcement and other sources as to the frequent use of such firms by drug cartels to launder drug money.  The article further reported that:

> Wachovia built up its ties to casas de cambio as a way to tap the Hispanic market, which doesn't always bank through traditional Main Street outlets. Wachovia served as a large partner, holding the foreign-exchange houses' deposits and providing back-office services.  In 2005, it introduced the *Dinero Directo* card to facilitate cross-border remittances.
>
> The bank pushed into the business despite well-publicized concerns from U.S. law enforcement that such firms were sometimes used to launder drug money. Wachovia declined to discuss why it pursued this business despite warnings.
>
> Internal emails and documents filed in federal courts in Miami, Chicago and New York describe former ties between Wachovia and money-changing firms. In a case in U.S. court in Miami, federal agents seized more than $11 million in 23 Wachovia accounts belonging to Case de Cambio Puebla, a Mexican chain. U.S. and Mexican prosecutors said they believed the money was being laundered, according to legal papers filed by Puebla.  Mexican police raided Puebla offices last fall, alleging relationships with a major drug cartel.

14

\* \* \* \* \*

In a recent affidavit, a U.S. representative for Majapara said that Wachovia had provided the Mexican firm with lines of credit, overdraft privileges and remittance-processing services. Wachovia, the court papers filed by Majapara said, provided "largely unsecured credit well in excess of $100 million on any given day." Majapara said that it previously gave its business to several banks, but that in February 2007, after Wachovia extended its large credit facility, it transferred virtually all of its business to Wachovia.

### Auction Rate Securities

36.    The term "auction rate security" typically refers to either municipal or corporate debt securities or preferred stocks which pay interest at rates set at periodic "auctions." Auction rate securities generally have long-term maturities, typically 30 years, and in the case of preferred stocks, no maturity date.

37.    Investments in auction rate securities were initially limited to institutional investors, with required minimums of $250,000. In recent years, however, issuers and sellers of auction rate securities have lowered the minimum amount invested to $25,000, in an effort to market auction rate securities as widely as possible to the general public.

38.    Auction rate securities were extremely profitable for Wachovia and for the Wachovia financial advisors who sold the securities. As a large underwriter of auction rate securities, Wachovia received significant underwriting fees from the issuers of these securities. As one of the largest broker-dealers, Wachovia also entered into broker-dealer agreements with the issuers and was paid an annualized broker-dealer fee for operating the auction process for more than auction rate securities. Wachovia also acted as a principal for its own account, using its access to inside information about the auction process to buy and sell auction rate securities

for its own account.  Individual Wachovia financial advisors had a significant financial incentive

to sell auction rate securities, as they were compensated by Wachovia for each auction rate

security sold.

      39.     In order to perpetuate the auction market and sell as many auction rate securities

as possible, the defendants, in the Company's written materials and uniform sales presentations

by financial advisors, caused to be represented to investors that auction rate securities were the

same as cash and were highly liquid, safe investments for short-term investing.  Pursuant to

uniform sales materials and top-down management directives, Wachovia financial advisors

throughout the United States represented to current and potential Wachovia clients that the

auction rate securities sold by Wachovia were equivalent to cash or money market funds and

were safe, highly liquid short term investment vehicles suitable for any investor with at least

$25,000 of available cash and as little as one week in which to invest.

      40.     The defendants and the Company failed to disclose to purchasers of auction rate

securities material facts about these securities, including that these securities were not cash

alternatives, like money market funds, and were instead, complex, long-term financial

instruments with 30 year maturity dates, or longer, and that the auction rate securities Wachovia

was selling were only liquid at the time of sale because Wachovia and other broker-dealers in the

auction market were artificially supporting and manipulating the market to maintain the

appearance of liquidity and stability.  In fact, the ability of holders of auction rate securities to

liquidate their positions depended on the maintenance of an artificial auction market maintained

by Wachovia and the other broker- dealers.  When Wachovia and the other broker-dealers

stopped artificially supporting and manipulating the auction market, the market immediately

collapsed and the auction rate securities sold by Wachovia became illiquid. The defendants and the Company also failed to disclose that the auction rate securities Wachovia was selling were not short-term investments, but rather long term bonds or preferred stocks with maturities sometimes exceeding 30 years. Finally, they failed to disclose that the short-term nature of the securities and the ability of investors to quickly convert their auction rate securities into cash depended entirely on the perpetuation of the artificial auction market being maintained by Wachovia and the other broker-dealers.

41.     Defendants and the Company also failed to disclose to purchasers of auction rate securities material facts about the Company's role in the auctions and the auction market in which these securities were traded. They failed to disclose that in connection with the sale of auction rate securities, Wachovia simultaneously was acting on behalf of the issuer, who had an interest in paying the lowest possible interest rate, on behalf of the investor, who was seeking the highest possible return, and on its own behalf, to maximize the return to Wachovia on its holdings of the auction rate securities. They failed to disclose that without this manipulation of the auction market, many auctions likely would have failed. Without such disclosure, investors could not determine the true risk and liquidity features of auction rate securities. Defendants continued to aggressively market auction rate securities after they had determined that Wachovia and other broker dealers were likely to withdraw their support for the periodic auctions and that a "freeze" of the market for auction rate securities would result to the detriment of investors.

42.     In the summer of 2007, some auctions for auction rate securities backed by sub-prime debt began to fail, but these securities represented only 2-6% of the entire auction rate securities market. In the fall-winter of 2007, more auctions began to fail. Even though some of

the auctions that failed initially were conducted by Wachovia, defendants and Wachovia continued to encourage investors to purchase auction rate securities and continued to represent to investors that these securities were the same as cash or money markets and were highly liquid, safe investments for short-term investing, without any disclosure of the material risks associated with the securities.

43.    On February 13, 2008, 87% of all auctions of auction rate securities failed when all of the major broker-dealers, including Wachovia, refused to continue to support the auctions.

44.    On February 14, 2008, it was disclosed that UBS, the second largest underwriter of auction rate securities, had decided to no longer support the auction market.  Virtually every other major broker-dealer, including Goldman Sachs, Lehman Brothers, Citigroup and Merrill Lynch, among others, also decided around the same time to withdraw their support of the auction market.  As a result of the withdrawal of support by all of the major broker-dealers, the market for auction rate securities has collapsed, rendering more than $300 billion of outstanding securities illiquid.

45.    On May 12, 2008, the Company reported that its affiliates, including Wachovia Securities LLC ("Wachovia Securities"), received inquiries and subpoenas from the SEC and state regulators regarding auction-rate securities.  Specifically, the regulators sought information relating to the underwriting, sale and subsequent auctions of municipal and preferred auction-rate securities, stemming from the Company and Wachovia Securities being named as defendants in a Federal class action lawsuit brought by investors in the Southern District of New York.  The lawsuit alleged that defendants misrepresented or failed to disclose numerous factors relating to the quality, risk and characteristics of the securities the defendants offered and sold, leaving, as a

result of the collapse of the market for auction rate securities in February 2008, the holders of over $300 billion in auction rate securities with no means of liquidating these investments.

46.    On or about July 17, 2008, the Company reported that securities regulators from several states who were investigating Wachovia Securities' auction rate securities sales practices, raided the Company's St. Louis headquarters as a result of its failure to fully comply with regulators' earlier requests for documents, e-mails, transcripts and other records relating to internal evaluations and marketing strategies for auction rate securities.

47.    Most recently, on August 11, 2008, the Company reported that the New York Attorney General Andrew Cuomo was expanding his investigation into the collapse of the auction-rate securities market to include Wachovia.

**BOLI Losses**

48.    BOLI policies are utilized by banks to offset the cost of wide-ranging employee benefit expenses, such as health care, disability, dental, group life insurance and certain retirement benefit expenses.  Although the owner of a BOLI policy may select the strategy for investment, it has no control over the active management of the underlying assets.  Under the applicable regulations, BOLI purchasers may not correspond with the investment manager of the underlying assets about particular investment decisions.  Rather, it is the insurer who is the legal owner of the assets and who must directly correspond with the investment manager, often with the advice of a broker who specializes in BOLI products.  Moreover, it is the insurer who exercises any rights pursuant to the BOLI policy in connection to the underlying assets – again, often in conjunction with a BOLI broker.

49.     Due to the nature of the relationship among parties to a BOLI contract, the insurer and a broker have contractual and fiduciary obligations to monitor the performance of the underlying assets and taking appropriate actions, such as advising and implementing risk mitigation mechanisms often offered in BOLI policies.

50.     On May 6, 2008, the Company reported that it sustained large losses as a result of the Company's overexposure to risk associated with BOLI securities.  The Company invested approximately $1 billion in the BOLI vehicles, and lost as much as $315 million as a result of the precipitous 75% plunge of Citigroup's Falcon Strategies hedge fund (the "Falcon Fund").

51.     On May 7, 2008, *Bloomberg* reported that the Company's BOLI losses widened the Company's first-quarter loss by 80% to $708 million.  According to the article, "[f]ederal regulators warned as long ago as 2004 that some U.S. banks were risking their financial stability because they spent too much on such policies, tying up capital.  'It appears the issuer of the stable-value agreements is reneging on making good its promise,'" said analyst Richard Bove, 'All of a sudden, BOLI is now another investment that emerges as one where this bank, and presumably others, did not do their due diligence properly.'  The article further reported that Fifth Third Bancorp, which lost approximately $323 million invested in the Falcon Fund, is suing the company from which it originally bought the policies, Transamerica Life Insurance Company, the insurer, and its partner in the deals, Clark Consulting, Inc., the broker, for failure to monitor and manage BOLI policies and their underlying assets with competence and the utmost good faith.

52.     The BOLI losses were imposed upon Wachovia, at least in part, due to the Director Defendants' failure, in breach of their fiduciary duties, to establish a system of internal

controls necessary to ensure that appropriate due diligence was performed for substantial investments.  Moreover, the Director Defendants, in violation of their fiduciary duties, have failed to make any similar attempt to recoup the losses the Company suffered from any insurer, broker, or investment adviser who failed to adequately manage the Company's BOLI policies causing Wachovia's loss as a result of the collapse of the Falcon Fund.

## DERIVATIVE ALLEGATIONS

53.     Plaintiff brings this complaint derivatively in the right and for the benefit of Wachovia to redress injuries suffered and to be suffered by Wachovia as a direct result of the violations of fiduciary and other common law duties by the defendants to Wachovia and its public shareholders.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

54.     Plaintiff will adequately and fairly represent the interests of Wachovia and its public shareholders in enforcing and prosecuting their rights.

55.     Plaintiff demanded that Wachovia's Board of Directors bring this or similar litigation in a letter addressed to the Board dated February 14, 2008 (attached hereto as Exhibit A) and a supplemental demand dated June 13, 2008 (attached hereto as Exhibit B).  Since that time, although more than six months have passed, Wachovia's Board  has acknowledged the receipt of Plaintiff's letters and assured Plaintiff's counsel that appropriate consideration of and a response to the demand would be made, defendants have not taken any of the actions demanded in the letters.  Subsequently, on July 28, 2008, Stephen G. Morrison of Nelson Mullins Riley & Scarborough LLP wrote to Plaintiff's counsel that the supplemental demand had been referred to the Special Committee "for their review and to take such actions as they deem appropriate in

investigating the matters referenced in the letter," and requested, among other things, that

Plaintiff provide proof of Plaintiff's ownership of Wachovia stock.  Plaintiff complied with this

request by a letter dated August 4, 2008.  Defendants have not had any further communication

with Plaintiff or her counsel, have not responded to counsel's telephone calls, and have not taken

any action to remedy the damages caused to Wachovia by the defendants' breaches of fiduciary

duties and/or aiding and abetting thereof.  Plaintiff submits that the Special Committee, which is

comprised of Wachovia's Board Members who are directly implicated by their authorizing and

permitting the conduct alleged herein and/or in its failure to detect and deter the illegal conduct

alleged herein, cannot conduct an adequate and independent investigation as Plaintiff demands.

Under these circumstances, the Board of Directors' inaction and silence can only be viewed as a

refusal of Plaintiff's demand.  The Board's refusal of Plaintiff's demand is wrongful.  The

Board's wrongful refusal of Plaintiff's demand, along with the following, among other facts,

demonstrate that the Board is not sufficiently disinterested or independent to control this or

similar litigation:

> (i)     The Company's Board has proven itself to be unwilling to bring remedial
>
>         action against wrongdoers that have caused the Company substantial harm
>
>         regarding conduct of which the Board was aware.  The Board made no
>
>         effort to recover any of these damages from the known wrongdoers;
>
> (ii)    There was a sustained and systematic failure of the Board to exercise
>
>         oversight, in that the directors knew or should have known of violations of
>
>         the Company's Corporate Governance Guidelines and U.S. civil and
>
>         criminal law, took no steps in an effort to prevent or remedy the situation,

and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses and intangible harm. The directors' decision to not act was not made in good faith and was contrary to the best interests of the Company;

(iii)   The acts complained of herein constitute violations of civil and criminal law and fiduciary and common law duties owed by the defendants and these acts are incapable of ratification;

(iv)   The defendants intentionally breached and/or recklessly and/or with gross negligence disregarded their fiduciary duties, by causing Wachovia to engage in the aforesaid illegal conduct, including enabling the massive fraudulent telemarketing scheme, money laundering activities and misrepresentations relating to auction rate securities;

(v)   The Board has failed to commence any action against the principal wrongdoers despite the passage of time since their wrongful acts were revealed and since demand was made;

(vi)   The known principal wrongdoers are in a position to, and do, dominate and control Wachovia's Board, paying them high annual and monthly fees to assure their compliance. Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

(vii)   The acts complained of herein are illegal and unreasonable and thus are incapable of ratification;

(viii)   In order to bring this action for breach of fiduciary and common law duties, the members of Wachovia's Board would expose themselves to criminal prosecution and would be required to sue themselves and/or their fellow current or former directors, with whom they are well acquainted and with whom they have entangling alliances, interests, and dependencies, which they would not do. They therefore would not be able to vigorously prosecute any such actions; and

(ix)   The Director Defendants receive substantial benefits, and other emoluments by virtue of their membership on the Board and their control of Wachovia. Bringing an action or even adequately investigating other directors, who have the power to terminate a director's employment, would not likely occur. The defendants are incapable of exercising independent objective judgment in deciding whether to bring this action.

## COUNT I
### (Breach of Fiduciary Duties)

56.   Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

57.   Each defendant owed Wachovia and its public shareholders the highest duties of loyalty, honesty, and care in conducting their affairs.

58.   At a minimum, to discharge these duties, each defendant should have exercised reasonable and prudent supervision over the management, policies, practices, controls and

financial affairs of Wachovia.  By virtue of these obligations, each defendant was required, <u>inter</u> <u>alia</u>:

      a.    to exercise reasonable control and supervision over the officers, employees, agents, business, and operations of Wachovia;

      b.    to be and remain informed as to how Wachovia was operating and, upon receiving notice or information of an imprudent, questionable, or unlawful decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and

      c.    to conduct the affairs of Wachovia in a lawful manner and in compliance with government rules and regulations.

59.    The defendants knowingly, intentionally, recklessly or negligently breached their fiduciary duties and, thereby, caused the Company to commit illegal acts, waste its assets, and impair its reputation and credibility for no legitimate business purpose, as a result of which Wachovia has been and continues to be substantially damaged.

60.    Accordingly, Plaintiff seeks on behalf of Wachovia monetary damages, injunctive remedies, and other forms of equitable relief.

### COUNT II
### (Indemnification)

61.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

62.    As alleged herein, the defendants, acting as officers and/or directors of Wachovia and, therefore, as its agents, breached their fiduciary duties to Wachovia and its public shareholders.

63.    Wachovia has suffered significant and substantial injury as a direct result of the defendants' knowing, intentional, or reckless breaches of their fiduciary duties as alleged herein. Plaintiff, on behalf of the Company, seeks relief from the defendants on the theory of indemnity for all such damages.

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.    Declaring that the defendants have breached their fiduciary duties as alleged herein;

B.    Directing defendants, jointly and severally, to account for all losses and/or damages sustained by Wachovia by reason of the acts and omissions complained of herein and remit those sums to Wachovia;

C.    Requiring the Director Defendants to remit to Wachovia all of their salaries, fees, bonuses, stock awards, and other compensation received for the periods when they breached their duties;

D.    Ordering that defendants and those under their supervision and control refrain from further violations as are alleged herein and to implement corrective measures that will rectify all such wrongs as have been committed and prevent their recurrence;

E.    Awarding pre-judgment and post-judgment interest as allowed by law;

F.    Awarding Plaintiff's attorneys' fees, expert fees, consultant fees, and other costs and expenses; and

G.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all matters so triable.

Dated: September 10, 2008

WEISS & LURIE

By: _____
Joseph H. Weiss (JW-4534)
David C. Katz (DK-6235)
Ilya Nuzov (IN-1955)
551 Fifth Avenue
New York, New York  10176
(212) 682-3025

STULL, STULL & BRODY
Jules Brody (JB-9151)
6 East 45th Street
New York, New York 10017
(212) 687-7230

*Attorneys for Plaintiff*

## **VERIFICATION**

I, Sandra Arace, declare under penalty of perjury as follows: I have read the annexed Verified Shareholder Derivative Complaint, know the contents thereof and the same are true and accurate to the best of my personal knowledge, information and belief, based upon the investigation of my counsel.

Executed on: September ⏀, 2008

SANDRA ARACE